**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

HERBERT MANAGO, JR.,

          Plaintiff,

v.                                      Case No. 3:16-cv-1508-J-32JBT

OFFICER GLASS, et al.,

          Defendants.

_____

## ORDER

## I.  Status

Plaintiff, an inmate of the Florida penal system, initiated this case by filing a pro se Civil Rights Complaint (Doc. 1) (Complaint) pursuant to 42 U.S.C. § 1983. He names as Defendants Officer Glass, Officer Robinson, Captain Swain, and Warden Drake. He claims that Defendants Glass and Robinson used excessive force on him, Captain Swain failed to intervene, and Warden Drake was deliberately indifferent in failing to protect Plaintiff from the other Defendants whom he knew to have violent propensities.

Before the Court is Defendants' Motion for Summary Judgment (Doc. 45) (Motion), with exhibits.[1] The exhibits include the Declarations of Defendant Robinson (Doc. 45-1), Defendant Glass (Doc. 45-2), and Defendant Swain (Doc. 45-3); Declarations regarding grievance appeals (Doc. 45-4) and institutional grievance appeals (Doc. 45-5); a Disciplinary Report Plaintiff received (Doc. 45-7); the Declaration of Dr. Timothy Whalen, Chief Clinical

_____

[1] The Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

Advisor for the Florida Department of Corrections (FDOC) (Doc. 45-8); Plaintiff's medical records (Doc. 45-9); a Use of Force Report (Doc. 45-11); and Plaintiff's Deposition (Doc. 52). The Court previously advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment may foreclose subsequent litigation on the matter, and gave him an opportunity to file a response to Defendants' Motion. See Order (Doc. 7). Plaintiff filed a Brief in Opposition (Doc. 57). He also filed a Declaration[2] (Doc. 56) and attached thereto two unsworn inmate-witness statements (Doc. 56-1).

## II. Summary of Parties' Pertinent Filings

### A. Plaintiff's Complaint[3]

On March 3, 2015, around 1:40 p.m. at Columbia Correctional Institution Annex, a search team consisting of several correctional officers, including Defendants Glass and Robinson, "suddenly stormed into the back door of the S-Dorm Quad 2 housing unit startling" Plaintiff. Doc. 1 at 7. Within minutes, Defendant "Robinson targeted and verbally ordered Plaintiff to immediately submit to a pat-down body search to which Plaintiff complied." Id. Defendant "Robinson discovered a cell-phone inside a home-made pocket on the inside of [Plaintiff's] gym-shorts." Id. "Robinson viewed and examined the device and simply placed it back into the pocket inside Plaintiff's shorts." Id. Plaintiff "then attempted to run away from

---

[2] Plaintiff did not sign his Declaration on the last page, but he did sign the certificate of service.

[3] The Court credits the "specific facts" pled in Plaintiff's sworn Complaint when considering the summary judgment Motion. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014) (citations omitted).

Defendant Robinson in order to get the phone out of his possession." Id. Plaintiff ran about 5 to 8 feet "before both Defendant Glass and Defendant Robinson grabbed him and slammed him to the concrete floor, and Plaintiff was immediately handcuffed behind his back." Id. "Robinson then struck [Plaintiff] numerous times with his knees in and about the face and head area, causing injuries to his face and head." Id. at 7-8. Despite Plaintiff being fully restrained, Defendant Glass "removed his flash light from his equipment belt and struck [Plaintiff] in the mouth causing a deep and painful cut in Plaintiff's mouth from which he beg[a]n to bleed profusely." Id. at 8. "During the time that the Plaintiff was being beaten by Officer Glass and Officer Robinson, Defendant Captain Swain entered the day-room area. He watched the assault take place and made no attempt to stop it." Id.

Plaintiff, while being videotaped, was then taken to the confinement unit. Id. "He was dizzy, bleeding badly, could barely keep his balance, in a lot of pain and his face was swelling." Id. Upon seeing Plaintiff, the confinement nurse "informed the Plaintiff and the officer in charge that the deep cut in his mouth required stitches immediately," and Plaintiff was taken to the medical unit "where he received several stitches in his upper lip." Id. Plaintiff complained "that he was also experiencing severe pain in his back and ribs," but "he was only provided a small amount of ibuprofen." Id. "For several days after the assault while in the confinement unit[,] Plaintiff complained to staff and sought medical attention for [a] visible amount of blood in his urine, severe pain in his back and ribs making both written and verbal sick-call requests several times. [Plaintiff] could not even get out of bed without the assistance of his cell-mate. Yet Plaintiff received no further medical attention." Id. at 8-9. Plaintiff began suffering "continuous migraine headaches, dizzy spells, and general physical

3

pain as a result of his injuries," as well as "unusual episodes of depression and problems with staying focused and a constant paranoia of being wrongfully assaulted by officers, even killed." <u>Id.</u> at 9.

On April 6, 2015, "Plaintiff filed an informal grievance regarding the matter of him being assaulted." <u>Id.</u> Plaintiff's grievance was approved to the extent that his allegations were reported to the inspector general for review. <u>Id.</u> After he filed the grievance, Plaintiff asked Defendant Swain "if he had seen what happened and what was he going to do about it." <u>Id.</u> According to Plaintiff, Defendant Swain responded, "'Well stuff happens. But I'll tell you what I will do. If you just keep your mouth shut about this, just let it go, I won't bring up them other charges on you. And we'll let you out of here in a few days.'" <u>Id.</u> at 9-10. Shortly thereafter, Plaintiff was transferred to Suwannee Correctional Institution. <u>Id.</u> at 10.

**B. Defendants' Motion**

Defendants argue: (1) Plaintiff failed to exhaust his administrative remedies as to all claims; (2) Plaintiff fails to establish an Eighth Amendment violation as to the excessive force and failure to intervene claims against Defendants Glass, Robinson, and Swain; (3) Plaintiff's injuries are <u>de</u> <u>minimis</u>; (4) Plaintiff is attempting to hold Defendant Drake liable on the theory of respondeat superior; (5) Defendants are entitled to qualified immunity; and (6) Defendants are immune from suit in their official capacities for damages. <u>See generally</u> Motion.

In his Declaration, Defendant Robinson states in pertinent part:

> [T]he allegations of excessive force made by Inmate Herbert Manago are untrue. The events which form the basis of this complaint involving Inmate Manago on the date of March 3, 2015, were as follows:

4

On March 3, 2015 at approximately 1:37 p.m., I approached Inmate Herbert Manago . . . in the dayroom of S-dorm Quad #2. At that time, I conducted an impromptu search of inmate Manago and discovered a homemade pocket sewn into his blue shorts, containing a cell phone.

I then called for Officer Glass to assist me in placing Inmate Manago into hand restraints. I ordered Inmate Manago to submit to hand restraints when Inmate Manago attempted to snatch away, at which time I grasped him around his upper torso and placed him on the floor, with the assistance of Officer Glass, while ordering him to cease his disorderly behavior to, to [sic] no avail. I then maintained my grasp until more staff arrived and applied restraints on Inmate Manago at which time all force ceased.

During the use of force, I did not hit Mr. Manago. Nor did I unnecessarily knee Mr. Manago. Furthermore, I [sic][4] see anyone else hitting or kneeing Inmate Manago in an unnecessary mann[er].

Only the force necessary to restrain[] Inmate Manago was used to bring him into compliance.

Doc. 45-1 (paragraph enumeration omitted).

Defendant Glass filed the following Declaration in support of the Motion:

[T]he allegations of excessive force made by Inmate Herbert Manago are untrue. The events which form the basis of this complaint involving Inmate Manago on the date of March 3, 2015, were as follows:

On March 3, 2015 at approximately 1:37 p.m., I was summoned to S-dorm Quad 2, to assist Officer Robinson in restraining Inmate Herbert Manago . . . . As I grasped Inmate Manago by his shirt, he attempted to snatch away, at which time I assisted Officer Robinson in placing Inmate Manago on the floor, while giving him direct verbal orders to submit to hand restraints, to no avail. I then grasped both of Inmate Manago's

---

[4] The Court assumes that Defendant Robinson intended to write, "Furthermore, I <u>did not</u> see . . . ."

hands until support staff arrived and applied restraints to him at which time all force ceased.

During the use of force, I did not hit Mr. Manago with a radio. Nor did I see anyone else hitting him. I did not see anyone kneeing Inmate Manago in an unnecessary manner. Only the force necessary to restrain[] Inmate Manago was used to bring him into compliance.

Doc. 45-2 (paragraph enumeration omitted).

Defendant Swain's Declaration states as follows:

[T]he allegations of excessive force made by Inmate Herbert Manago are untrue. The events which form the basis of this complaint involving Inmate Manago on the date of March 3, 2015, were as follows:

On March 3, 2015 at approximately 1:37 p.m., I responded to staff utilizing force in S-dorm Dayroom Quad #2[.] I assisted by grasping Inmate Herbert Manago's . . . right arm until restraints were applied by supporting staff. Once restrained, no further force was necessary.

During the use of force, I saw no one hitting or kneeing Inmate Manago in an unnecessary manner. Only the force necessary to restrain[] Inmate Manago was used to bring him into compliance.

Doc. 45-3 (paragraph enumeration omitted).

### C. Plaintiff's Deposition

The following testimony was taken on May 18, 2018. In describing the incident, Plaintiff stated:

A.     Now I'm in the dayroom area, the living area. And when he [(Defendant Robinson)] tells me to come here, I -- I comply. I go over there. And then he began to search me. So upon his searching me, he finds a cell phone in a homemade pocket. So when he finds the cell phone in the homemade pocket, he looked at the cell phone. He puts it back because how the -- how he stretch my pants, you can literally go take it

out or not, like that (phonetic). So he looks at it -- I say, "Okay." At this point, I pretty much know I'm going to confinement, 'cause he's caught me with this phone. So he drops the phone back into the homemade pocket.

. . . .

Pretty much gave it [(the cell phone)] back to me. At that moment, I attempt to flee Officer Robinson. I don't make it too far. I may make it about, say, 10 feet, maybe. (Witness nods head.) That's just me guesstimating. At this time, Officer Robinson and, I strongly believe, Officer Glass, as well --

Q      Why do you strongly believe it was Officer Glass?

A      Because they both grabbed me. I felt -- because I -- I just left him, so Officer Glass runs out of -- of 108, 'cause we weren't too far away from 108 when -- when he started to search me. So Officer Glass and Officer Robinson pretty much, they grabbed me around the same time, I suppose, and they slammed me on my head (demonstrating). So they slammed me on my head. I'm probably knocked out about -- in an unconscious state for maybe about 20 seconds. And I know I was unconscious because I've -- how I felt. I've actually experienced being placed in a -- what they call "a knocked-out state" before. So I was, like -- it was almost like an out-of-body experience. So when I come back to, when I finally get my wits back, I-- I begin to panic a little bit because now, as I told you earlier, the search team, you have 6 to 10 officers. Now, it's become a physical altercation, a use of force is being conducted right now, once I begun my actions of trying to break away. So when they slammed me, now about six officers are on top of me.

Q      What were you doing? You said you tried to break away?

A      This was prior to. This was when he put the cell phone back into my pocket, I -- I tried to flee.

. . . .

And as I fleed (sic), they both grabbed me and they slammed me to the ground. So now I'm unconscious, like I say, roughly

7

about 20 to 30 seconds. So when I come back to, I'm kind of panicking. I'm already handcuffed. At this time, they've already handcuffed me within that 20-second span. I've been handcuffed. So about six officers on me at this time. There's nothing that I can do. So I kind of squirm a little bit. And I'm -- now I'm kind of talking out of my head. I'm like, "Get off me. Get off me." So when I say "get off me," Officer Glass takes his flashlight off of his . . . his equipment belt, and then he strikes me in my . . . upper left lip with the flashlight.

. . . .

So when he strikes me with the flashlight to my upper left lip, immediately I bleed, and bleeding very bad. Blood is everywhere. I have a whole puddle of blood right there on the ground. I'm going to say around the time frame of maybe -- anywhere from 15 to 30 seconds after I'm hit with this flashlight, Captain Swain comes into the building and he sees that I've been hit with this flashlight. And they were fixing to actually implement chemical agents, as well. So Officer -- I mean, Captain -- excuse me -- Captain Swain says, "Stop. Stop. Stop. Don't spray him." So they stopped spraying -- they didn't spray me. They picked me up off the ground, and we then go from S dorm, Quad 2 to P dorm -- no, excuse me -- to H dorm, I think it was called there, which is the confinement unit. Now –

. . . .

Q      Okay. So, now, what did Robinson do?

A      Robinson slammed me and he was the one that actually put the handcuffs on me and you know, escorted. Actually, Robinson, that's the one who actually wrote the -- the actual infraction DR.

. . . .

Q      . . . . Now, you said Captain Swain came in. At what point did he come in?

A      He came in around the time that I was struck with the flashlight, a few seconds later. 'Cause before then, I hadn't seen him. And, like I say, when they came in, they came in

8

from the back, so I seen everybody who came in at the -- when they initially came into the dorm, as well, as I was always -- I was vigilant (phonetic) all the way into the point where I was told to -- by Officer Robinson said he wanted to conduct a search and then after that, as you know now, I'm on the ground. So I remember, talking about vividly, that he comes in almost immediately after I'm hit with this -- with this flashlight.

> Q    Okay.

> A    And, like I say, he tells them, "Stop." I remember him instructing them not to administer the chemical agents.

Doc. 52-1 at 14-21.

### D. Plaintiff's Opposition and Declaration

Plaintiff largely reiterates the facts as alleged in his Complaint, and contends that his Declaration, along with the two inmate-witness statements he submitted, contradicts Defendants' Declarations. He asserts that Defendants Glass and Robinson used excessive force on him after he was restrained while Defendant Swain was present and able to intervene, but failed to do so. He further contends that whether Defendant Drake "being the warden of the Institution ha[d] direct knowledge of the reputation and propensities of the Defendants . . . to exact excessive force upon prisoners, is a factual dispute material to this case." Doc. 57 at 5.

Inmate Danny Waiters' unsworn statement, dated April 7, 2015, reads as follows:

> On March 3, 2015 I was in "S-Dorm Quad 2" at 1:45 p.m. when I saw Officer Glass . . . hit Inmate Manago with a object that look like[] a flash-light. Inmate Manago had already been placed in restraints when he was assaulted by Officer Glass. I'm willing to testify in court about what I seen and I'm also willing to be interviewed by the inspector/investigator.

Doc. 56-1 at 2.

Inmate Adrian Hawthorne's unsworn statement, dated April 7, 2015, states:

> On March 3, 2015, I was present in "S-dorm Quad-2" at 1:50 p.m. or around that time when I observed Officer Glass . . . hit inmate Manago with a object[] that look like a flash-light. Inmate Manago had been placed in restraints and could not harm anyone when he was assaulted by Officer Glass. I'm willing to testify in court about what I seen and I'm also willing to be interviewed by the inspector/investigator.

Doc. 56-1 at 3.

## III.  Standard of Review

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting Jurich v. Compass Marine, Inc., 764 F.3d 1302, 1304 (11th Cir. 2014)); see Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Bowen v. Manheim Remarketing, Inc., 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted); see Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1311 (11th Cir. 2018) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotations and citation omitted)). In considering a summary judgment motion, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." Hornsby-Culpepper, 906 F.3d at 1311 (quotations and citation omitted).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote and citation omitted); see Winborn v. Supreme Beverage Co. Inc., 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam) ("If the movant satisfies the burden of production showing that there is no genuine issue of fact, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" (quoting Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008)). "'A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.'" Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir.1990) (internal quotations omitted)).

## IV.  Analysis

### A. Exhaustion of Administrative Remedies

A prisoner must exhaust his available administrative remedies before filing a § 1983 action in this Court with respect to prison conditions. See 42 U.S.C. § 1997e(a); Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008) (finding that exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA); see also Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory."). A prisoner, however, is not required to plead exhaustion. See Jones v. Bock, 549 U.S. 199, 216 (2007). Instead, "failure to exhaust is an affirmative defense under the PLRA[.]" Id.

"[T]he PLRA exhaustion requirement requires proper exhaustion." Woodford, 548 U.S. at 93.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."

Id. at 90 (citations omitted). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules . . . ." Id.; see Pavao v. Sims, 679 F. App'x 819, 823 (11th Cir. 2017) ("The prison's requirements, and not the PLRA, define the boundaries of proper exhaustion, so 'the level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim.'" (quoting Dimanche v. Brown, 783 F.3d 1204, 1211 (11th Cir. 2015)). As such, "courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" Ross v. Blake, 136 S. Ct. 1850, 1862 (2016).

Generally, to properly exhaust administrative remedies, a Florida prisoner must complete a three-step process: "(1) file an informal grievance with a designated prison staff member; (2) file a formal grievance with the institution's warden; and then (3) submit an appeal to the Secretary of the FDOC." Dimanche, 783 F.3d at 1211 (citation omitted). The determination of whether an inmate exhausted his available administrative remedies prior to filing a cause of action in federal court is a matter of abatement and should be raised in a motion to dismiss, or if raised in a motion for summary judgment, be treated as if it were

raised in a motion to dismiss.[5] Bryant, 530 F.3d at 1374. Courts employ a two-step process when examining the issue of exhaustion.

> First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust.

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015) (citations omitted); see Pavao v. Sims, 679 F. App'x at 823-24.

The facts in this case regarding exhaustion are not in material conflict. The parties agree that Plaintiff filed an informal grievance dated April 6, 2015, which stated:

> Comes Now, I would like to inform you that on 3-3-15 at or around 1:50 p.m. in "S-dorm Quad-2," I was physically assaulted by Officer Glass, A.J./GAJ12. There's video evidence to support my claims as well as statements from several eye-witnesses. The reason for the delay is that I had and still have fear that once I report this incident that I could and possibly still be beaten and murdered. I'm requesting that a full investigation be conducted by you and that this incident be reported to the IG's Office as soon as possible.

Doc. 45-5 at 4 (copy also attached to Complaint (Doc. 1-1 at 1)). The grievance was "approved in that [Plaintiff's] allegations [were] reported to IG Management for review and action as deemed appropriate." Id. The institution's response specifically noted that the grievance was "Approved" and stated: "If your informal grievance is denied, you have the

---

[5] Although Defendants raised their failure-to-exhaust defense in a motion for summary judgment, the Court will treat the issue as if it had been raised in a motion to dismiss. See Bryant, 530 F.3d at 1374-75.

right to submit a formal grievance." Id. (emphasis added). Given the approval of Plaintiff's grievance and the fact that it was referred to the Inspector General for "review and action," the Court finds Plaintiff was not required to proceed through the rest of the grievance process. See Williams v. Dep't of Corr., 678 F. App'x 877, 881 (11th Cir. 2017) ("Because that informal grievance was addressed and approved, [the plaintiff] was not required to submit any further grievances about the classification system or his improper transfer to the Jackson prison. As a result, he exhausted his administrative remedies on those issues and was entitled to pursue a cause of action based on them."); see also Fulmore v. Leigh, No. 8:12-CV-1705-T-30EAJ, 2014 WL 2441864, at *7 (M.D. Fla. May 30, 2014) (unpublished) ("Plaintiff was not required to appeal or take further action on this grievance once it had been approved in order to exhaust administrative remedies.").

Apparently, Defendants' argument is that because Plaintiff only mentioned Defendant Glass in his informal grievance, he failed to exhaust his claims as to the other Defendants. However, "[t]he exhaustion requirement, allowing prison officials to address complaints in the first instance, is satisfied as long as the inmate's grievance provides sufficient detail to allow prison officials to investigate the alleged incident." Maldonado v. Unnamed Defendant, 648 F. App'x 939, 953 (11th Cir. 2016).

> A prisoner need not name any particular defendant in a grievance in order to properly exhaust his claim. Jones, 549 U.S. at 219; see also Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000) ("[W]hile § 1997e(a) requires that a prisoner provide as much relevant information as he reasonably can in the administrative grievance process, it does not require that he do more than that."). Section 1997e(a)'s exhaustion requirement is designed "to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued . . . ." Jones, 549 U.S. at 219 (quoting Johnson v.

> Johnson, 385 F.3d 503, 522 (5th Cir. 2004)). The statute
> merely requires inmates to complete the administrative review
> process in compliance with the prison's grievance procedures,
> so that there is "time and opportunity to address complaints
> internally before allowing the initiation of a federal case."
> Woodford, 548 U.S. at 93 (alteration and quotation marks
> omitted).

Parzyck v. Prison Health Servs., Inc., 627 F.3d 1215, 1218-19 (11th Cir. 2010) (internal

citations modified).

Plaintiff properly grieved the incident forming the basis of this lawsuit.[6] He alerted the

institution to the incident and afforded them the opportunity to internally investigate his

assertions. While he only named Defendant Glass in the grievance, in this instance, the

Court finds the grievance was sufficient to put the FDOC on notice of Plaintiff's allegations,

and it "accomplished § 1997e(a)'s purpose by alerting prison officials to the problem and

giving them the opportunity to resolve it before being sued." Id. at 1219. With respect to

exhaustion, Defendants' Motion is due to be denied.[7]

_____

[6] The Florida Administrative Code requires informal grievances to be "legible," include "accurately stated" facts, and address "only one issue or complaint." Fla. Admin. Code r. 33-103.005(2)(b)(2). Absent an exception, informal grievances "[m]ust be received within 20 days of when the incident or action being grieved occurred." Fla. Admin. Code r. 33-103.011(1)(a). Although Plaintiff's grievance was filed more than 20 days after the incident, the FDOC did not return his grievance as untimely, and this Court will not "enforce[] a procedural bar that may have been waived by the prison." Whatley, 802 F.3d at 1214; see Whatley v. Smith, 898 F.3d 1072, 1084 (11th Cir. 2018) (holding "that a prison waives its procedural objections to considering the merits of a grievance, and therefore waives its exhaustion defense, if it does not explicitly rely on the grievance's procedural shortcomings as an adequate and independent ground for denying the grievance at the administrative level").

[7] Moreover, as to Defendant Drake, he failed to raise this exhaustion defense in his motion to dismiss (Doc. 26). Indeed, the argument in his 3-page motion to dismiss focused on his belief that Plaintiff failed to state a claim against him under Federal Rule of Civil Procedure 12(b)(6) (although in the "wherefore" clause he sought dismissal for "failure to exhaust administrative remedies and failure to state a claim upon which relief may be

**B. Excessive Force - Robinson and Glass**

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. "[T]he core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). "If force is used 'maliciously and sadistically for the very purpose of causing harm,' then it necessarily shocks the conscience." Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (per curiam) (quoting Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir. 1987)). Courts consider the following factors when analyzing whether force was used maliciously and sadistically:

> (1) "the extent of injury"; (2) "the need for application of force"; (3) "the relationship between that need and the amount of force used"; (4) "any efforts made to temper the severity of a forceful response"; and (5) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them."

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)); Miles v. Jackson, - - - F. App'x - - -, 2018 WL 6433684, at *1 (11th Cir. Dec. 7, 2018). "When considering these factors, [courts] 'give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance.'" Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam) (quoting Cockrell, 510 F.3d at 1311).

---

granted"–this was simply a scrivener's error as the substance of the motion did not address exhaustion). The Court denied the motion to dismiss on November 3, 2017. See Order (Doc. 29). Thus, Defendant Drake forfeited the right to raise the defense in a subsequent motion. See Brooks v. Warden, 706 F. App'x 965, 969 (11th Cir. 2017) ("[T]he exhaustion defense is subject to forfeiture under Rule 12(g)(2)." (citation omitted)).

"The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition <u>de minimis</u> uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Hudson</u>, 503 U.S. at 9-10 (internal quotations and citations omitted). Indeed, not "every malevolent touch by a prison guard gives rise to a federal cause of action." <u>Id.</u> at 9 (citation omitted). "While a lack of serious injury is relevant to the inquiry, '[i]njury and force . . . are only imperfectly correlated and it is the latter that ultimately counts.'" <u>Smith v. Sec'y, Dep't of Corr.</u>, 524 F. App'x 511, 513 (11th Cir. 2013) (quoting <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 38 (2010)). "A prisoner may avoid summary judgment, 'only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain.'" <u>Stallworth v. Tyson</u>, 578 F. App'x 948, 953 (11th Cir. 2014) (quoting <u>Brown</u>, 813 F.2d at 1188).

Plaintiff claims that Defendants Robinson and Glass used excessive force on him after he was restrained. Defendants deny that any excessive force was used, and assert that only the force necessary to restrain Plaintiff was used to bring him into compliance. While Plaintiff's deposition testimony may be deemed inconsistent with some of his allegations, any such inconsistencies cannot be resolved on summary judgment. The parties' conflicting versions of events precludes entry of summary judgment. Thus, as to the excessive force claims against Defendants Glass and Robinson, the Motion is due to be denied.

### C. Failure to Intervene - Swain

Plaintiff claims that Defendant Swain failed to intervene during the use of force. He alleges in the Complaint that Swain was in a position to intervene but failed to do so.

However, his deposition testimony indicates that Swain did not enter the room until after Glass allegedly hit Plaintiff with the flashlight. Defendant Swain avers that he held Plaintiff's right arm until restraints were applied, which suggests Defendant Swain was present when Plaintiff alleges the excessive force was used. Thus, given the conflicting versions of events, the Motion is due to be denied to the extent Swain seeks entry of summary judgment in his favor.

### D. Failure to Protect - Drake

Plaintiff claims as follows with respect to Defendant Drake:

> Defendant Warden Drake exercised deliberate indifference to Plaintiff Manago's health and safety by failing to take proper corrective disciplinary actions against the officers named above in this Complaint whom he knew to have violent propensities, and encourage the continuation of excessive physical violence indulged in by staff by rarely investigating reports of such misconduct. By failing to take reasonable measures to prevent the Plaintiff from being assaulted by corrections officers, Defendant Drake also violated Plaintiff Manago's rights under the Eighth Amendment.

Doc. 1 at 12; see Doc. 56 at 4 ("Defendant Drake . . . was aware of the propensity of the other Defendants to use force excessive against inmates based on their histories at the institution, but he failed to take the proper steps to remedy the problem."). Plaintiff explained at deposition:

> Q    . . . . So was the warden involved in the incident?

> A    Yes, ma'am, as far as the fact that, at that time, there were a lot of allegations being brought against officers, of abuse. And it's his responsibility as a warden to ensure that his institution is ran, you know, properly. And that the officers are being informed on how to conduct themselves with inmates.

Q        Okay. You said, "There were a lot of allegations of abuse." Can you tell me about some of the allegations?

A        Yeah, it was actually while I was in confinement . . . when I was sitting back there, then, it was actually a few officers accused of killing an inmate in . . . confinement at the time. They said they killed in confinement and they moved him to the other -- cause you know you have the Annex and the Main Unit -- there was something said that they killed him in -- in the confinement at the Annex.

Q        Do you recall how they killed him?

A        They said they smothered him and beat him. It was very -- it was a very, very violent death. And, what they say, threw him in the cell with his roommate to try to make it like the roommate killed him.

Q        When he was in confinement?

A        Yes, ma'am.

Q        Okay. What about where you were?

A        Where I was at, yeah, there was all type of -- all type of abuse. . . . I can even recall several events where I've witnessed officers, you know, beating on inmates. And that was known at that time that, you know -- and especially dealing with the particular Officer Glass, he was one of the most notorious of the officers, as far as, like, people was -- when they -- when you see Glass, you trying to get your act together, you know what I'm saying? He was known to . . .

Q        Can you give me specific allegations about Glass?

A        Not far as detail for detail. . . . It was more rumor-based as far as I'm concerned. I can't point to no one pacific (sic) thing or, you know, case number, anything of that nature, concerning his behavior with other inmates. But it was widely known that, you know, Officer Glass would kind of go above and beyond duty to get his point across.

Q        What about Robinson?

A        Actually, I have very little prior knowledge of Officer Robinson because Officer Robinson, from my understanding, was an officer that worked at the work camp -- I mean, that worked at the -- the Main Unit while we was -- I was at the Annex.

Q        Okay. What about Swain?

A        Oh, Captain Swain . . . as is noted, he is -- he was the one that was the head of -- of this search team. And Captain Swain, he goes back in DOC; he's, like, an old legend in DOC, as far as being a -- a correctional officer. And he goes all the way back to, like, FSP days, Florida State Prison days, where they were known to beat on inmates and kill inmates and it's all type of connections with him in multiple deaths or multiple investigations that I had been hearing about since I've been in prison. His . . . reputation actually preceded him by years with me, so . . .

And what -- and then now, if you ask me, can I point to any type of specifics? No, ma'am, I can't. A lot of this is rumor-based. However, I looked at it like it had some legitimicy (sic) to it. And he's -- I think he's been under investigation from different times. Nothing I can personally investigate, but from my understanding, that's . . .

Q        So you're -- you're actually saying that the warden is responsible for rumors, then?

A        Well, no, . . . what I'm saying is that the warden has responsibility as the supervisor, the head supervisor, to ensure that his institution is being governed by the proper practices of DOC; meaning that, you know, inmates should not be abused and any type of investigation should be looked into and that he should make a conclusion based on that to either continue to employ that particular officer or to, you know (inaudible response given) --

. . . .

A        -- fire him.

. . . .

20

> Q      I need to know how it is that the warden failed you?
>
> A      Because in his professional capacity --
>
> . . . .
>
> A      - - he failed to protect me by allowing these officers, after rumors and . . . possibly investigations, to continue to be on his . . . compound that he was the warden over, and -- which led to me being assaulted by these officers. 'Cause had he taken the proper steps and reprimanded these officers, investigating these officers properly, then there's a great possibility that I would have never been assaulted by Officer Glass.

Doc. 52-1 at 25-29.

Defendants argue that the claim against Defendant Drake should be dismissed because his "position alone, without more, does not subject him to liability." Motion at 19. "Supervisory officials cannot be held vicariously liable under section 1983 for the actions of their subordinates unless the supervisor 'personally participates in the alleged unconstitutional conduct' or 'there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.'" Smith v. Deal, No. 18-13424, 2019 WL 378568, at *2 (11th Cir. Jan. 30, 2019) (quoting Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)). "A causal connection can be established when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Smith v. LePage, 834 F.3d 1285, 1298 (11th Cir. 2016) (quotations and citation omitted). A causal connection also "'can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'"

Knight through Kerr v. Miami-Dade Cty., 856 F.3d 795, 820 (11th Cir. 2017) (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)). "But one incident will not suffice; rather, [t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Id. (quotations and citation omitted). "[T]he standard by which a supervisor is held liable in h[is] individual capacity for the actions of a subordinate is extremely rigorous." Id. (quotations and citation omitted).

Defendants argue that "Plaintiff has offered no evidence that Defendant Drake personally participated in any way in the events surrounding this incident, or that they [sic] had any knowledge of prior attacks under remotely similar circumstances, nor had any specific knowledge about the events involved in this incident, which cannot support Plaintiff's claims." Doc. 45 at 20. Additionally, they argue that "Plaintiff has no specific information regarding a specific Defendant to state facts that the Warden should have taken corrective actions." Id. Defendants cite to Plaintiff's deposition testimony to support the notion that he cannot prove his claim. The Court agrees.

"When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' in order to discharge this initial responsibility. Instead, the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" Gonzalez v. Lee Cty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986)). "If the nonmoving party 'fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then there is no genuine dispute as to any material fact because 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" Alston v. City of Darien, 750 F. App'x 825, 831 (11th Cir. 2018) (quoting Celotex Corp., 477 U.S. at 322-23); see also Lowe v. Exel, Inc., No. 18-12518, 2019 WL 410267, at *1 (11th Cir. Jan. 31, 2019) ("[I]f the non-moving party fail[s] to make a showing on an essential element of his case with respect to which he ha[s] the burden of proof, then the entry of judgment as a matter of law is appropriate." (quotations and citation omitted)).

Plaintiff does not allege that Defendant Drake personally participated in or witnessed the use of force. Rather, he alleges that Defendant Drake was deliberately indifferent in failing to take corrective action against the Defendants for their prior violent behaviors. But Plaintiff's theory of liability is based on rumors about other unnamed officers and Defendants and the reputations of Defendants Glass and Swain. Plaintiff has not presented any actual information with respect to any of the Defendants' prior actions that would render Defendant Drake subjectively aware of an issue. He has not shown that there was a negative history between himself and Defendants Glass, Robinson, or Swain. He has not shown, or even alleged, that he complained to the Warden (or anyone else) about these Defendants prior to this incident. Neither has he described with any detail a history of widespread abuse. Plaintiff's unsupported allegations are insufficient to withstand summary judgment.

Plaintiff had adequate time to conduct discovery, and indeed the Court ordered Defendants to respond to Plaintiff's interrogatories prior to Plaintiff filing a response to the

Motion. <u>See</u> Docs. 48, 53, 55. Yet, Plaintiff has failed to adduce any evidence that would establish the requisite causal connection required to hold Defendant Drake liable. Thus, the Motion in this regard is due to be granted.

### D. <u>De Minimis</u> Injury

"The [Prison Litigation Reform Act (PLRA)] places substantial restrictions on the judicial relief that prisoners can seek, with the goal of 'reduc[ing] the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to pursue their complaints.'" <u>Brooks v. Warden</u>, 800 F.3d 1295, 1307 (11th Cir. 2015) (quoting <u>Al-Amin v. Smith</u>, 637 F.3d 1192, 1195 (11th Cir. 2011)). Section 1997e(e) of the PLRA provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). "Tracking the language of the statute, § 1997e(e) applies only to lawsuits involving (1) Federal civil actions (2) brought by a prisoner (3) for mental or emotional injury (4) suffered while in custody." <u>Napier v. Preslicka</u>, 314 F.3d 528, 532 (11th Cir. 2002). The statute does not define "physical injury," but the Eleventh Circuit has clarified that, "in order to satisfy section 1997e(e), the physical injury must be more than <u>de minimis</u>, but need not be significant." <u>Harris v. Garner</u>, 190 F.3d 1279, 1286 (11th Cir.1999), <u>reh'g en banc granted and opinion vacated</u>, 197 F.3d 1059 (11th Cir.1999), <u>opinion reinstated in relevant part</u>, 216 F.3d 970, 972 (11th Cir. 2000). The "<u>de minimis</u>" injury standard is far from exact, but it does not require multiple or significant injuries. Rather, the injury must be only more than "<u>de minimis</u>," which has been described as "'an observable or diagnosable medical condition

requiring treatment by a medical care professional.'" <u>Thompson v. Sec'y, Fla. Dep't of Corr.</u>, 551 F. App'x 555, 557 n.3 (11th Cir. 2014) (quoting <u>Luong v. Hatt</u>, 979 F. Supp. 481, 486 (N.D. Tex. 1997)). While compensatory and punitive damages are precluded in the absence of a more than <u>de minimis</u> physical injury, "nominal damages may still be recoverable." <u>Al-Amin</u>, 637 F.3d at 1198.

It is undisputed that Plaintiff suffered an observable physical injury–the laceration requiring stitches.[8] Plaintiff states in his Complaint that immediately after the assault, he also experienced severe pain in his back and ribs, and for several days after the assault, he complained about blood in his urine and severe pain in his back and ribs. He describes debilitating pain (being unable to get out of bed without assistance), but states that despite requesting medical attention, he received no follow-up care. He further asserts that he began having migraines, dizzy spells, and general physical pain, as well as episodes of depression and problems with staying focused and paranoia. He also sought treatment for headaches and severe back pain more than one year after the incident. <u>See</u> Doc. 45-9 at 5, 8. Considering the record in the light most favorable to Plaintiff, at this point, the Court finds that the Motion is due to be denied in this regard.

---

[8] The medical records submitted do not show the amount of stitches received. A handwritten note from that day appears to reflect that the laceration to his upper lip was approximately 1-2 centimeters deep. Doc. 45-9 at 42; <u>see also</u> Declaration of Dr. Whalen (Doc. 45-8 at 1-2) (indicating that Plaintiff "received sutures for a laceration that was 1-2 cm in length). Plaintiff testified at deposition that he received two stitches, Doc. 52-1 at 22, while in his Complaint and summary-judgment submissions he refers to "several stitches." Doc. 1 at 8; Doc. 56 at 3.

**E. Qualified Immunity**

Defendants claim they are entitled to qualified immunity "because force was only used against Plaintiff when he attempted to run away from Defendants as they attempted to remove contraband from his person." Motion at 21. While Defendants were certainly entitled to use some force given Plaintiff's attempt to flee with contraband, Plaintiff alleges they continued to use force after he was restrained. Given that the material facts are in dispute with respect to whether Defendants used excessive force and failed to intervene, the Court finds Defendants are not entitled to qualified immunity at this time.

**F. Official Capacity Claims**

Absent a waiver or action by Congress, the Eleventh Amendment bars a damages suit against a state or a state official in his or her official capacity. Kentucky v. Graham, 473 U.S. 159, 169 (1985); see Zatler v. Wainwright, 802 F.2d 397, 399-400 (11th Cir. 1986) (per curiam). "Congress has not abrogated the states' sovereign immunity for purposes of section 1983 suits for damages, and Florida has not waived its immunity with regard to such suits." Wusiya v. City of Miami Beach, 614 F. App'x 389, 393 (11th Cir. 2015) (citing Gamble v. Fla. Dep't of Health & Rehab. Servs., 779 F.2d 1509, 1512, 1520 (11th Cir. 1986)). Therefore, to the extent Plaintiff is suing Defendants in their official capacities under § 1983 for monetary damages, such claims are dismissed.

Accordingly, it is

**ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. 45) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED to the extent** that Defendant Drake is

entitled to entry of summary judgment in his favor, and all claims for monetary damages against Defendants in their official capacities are **DISMISSED with prejudice**. Judgment to that effect is withheld pending adjudication of the action as a whole. <u>See</u> Fed. R. Civ. P. 54. The Motion is otherwise **DENIED**.

     2.    The parties shall confer in good faith regarding the possibility of settlement. By **April 4, 2019**, they shall notify the Court whether they have settled this case, and if not, whether they wish to have this case referred to a United States Magistrate Judge for a settlement conference.

     **DONE AND ORDERED** at Jacksonville, Florida, this 4th day of March, 2019.

_____
TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 2/14
c:
Herbert Manago, Jr., #V25844
Counsel of Record